## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SPENCER MILL,

       Plaintiff,

    v.

NATIONWIDE PROPERTY AND
CASUALTY INSURANCE CO.,

       Defendant.

No. 4:23-CV-00905

(Chief Judge Brann)

## MEMORANDUM OPINION

### NOVEMBER 26, 2024

## I.    BACKGROUND

At the end of an evening of heavy drinking, Brandon Peddigree smashed a beer bottle over Spencer Mill's head. Mill's eye was seriously damaged. Peddigree turned himself in to the authorities and eventually pled guilty to simple assault and reckless endangerment of another person. When Mill brought a civil suit against Peddigree, Peddigree turned to his insurer, Nationwide, for a defense. But Nationwide denied his claim and withdrew its attorney from the litigation. Facing personal liability, Peddigree settled the case with Mill, agreeing to a judgment of $650,000 in exchange for assignment of the right to pursue recovery from Nationwide and Mill's promise not to execute the judgment against him personally. Now, Mill is suing Nationwide, seeking a declaratory judgment that it

was wrong to refuse to defend Peddigree and contending that it has a duty to indemnify him for the claim value pursuant to the settlement.

Currently pending before the Court are cross-motions for summary judgment.[1] They are ripe for resolution. For the reasons below, Mill's Motion for Summary Judgment is granted in part and denied in part, and Nationwide's Motion for Summary Judgment is denied.

## II.    DISCUSSION

### A.    Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[2] Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[3] A defendant "meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[4] Conversely, to survive summary judgment, a

---

[1]    Docs. 15, 21.

[2]    Fed. R. Civ. P. 56(a).

[3]    *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010).

[4]    *Clark v. Mod. Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993).

plaintiff must "point to admissible evidence that would be sufficient to show all elements of a prima facie case under applicable substantive law."[5]

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[6] the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[7] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the Court may "consider the fact undisputed for purposes of the motion."[8] Finally, although "the court need consider only the cited materials, . . . it may consider other materials in the record."[9]

"This standard does not change when the issue is presented in the context of cross-motions for summary judgment.'"[10] "When both parties move for summary judgment, 'the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'"[11]

---

[5]  *Id.*

[6]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 448 (1871)).

[7]  *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

[8]  Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613-14 (3d Cir. 2018).

[9]  Fed. R. Civ. P. 56(c)(3).

[10]  *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (quoting *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987)).

[11]  *Id.* (quoting 10A Charles Alan Wright et al., *Federal Practice & Procedure* § 2720 (3d ed. 2016)).

### B.    Admissible Evidence

Before turning to the facts, the Court must resolve the parties' dispute regarding the admissibility of testimony from the earlier litigation arising from this incident. Mill offers Peddigree's sworn interview testimony, Jordan Dauberman's voluntary police statement, general affidavit, and deposition testimony, and an investigator's interview notes for John Rickert and Courtney Quiggle.[12] Nationwide objects to this evidence as inadmissible hearsay.[13]

"[H]earsay statements can be considered on a motion for summary judgment if they are capable of admission at trial."[14] To justify Court consideration of hearsay on a motion for summary judgment "[t]he proponent need only 'explain the admissible form that is anticipated.'"[15] In *Fraternal Order of Police, Lodge 1 v. City of Camden*, the United States Court of Appeals for the Third Circuit held that the district court should have considered hearsay statements relayed through depositions taken from other witnesses on a motion for summary judgment when the plaintiff "identified the out-of-court declarants . . . and noted their ability to

---

[12]    Docs. 23-12, 23-13, 23-15, 23-16, 23-17, 23-18, & 23-19.

[13]    Doc. 17 (Nationwide Brief) at 18-20.

[14]    *Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 223 n.2 (3d Cir. 2000) (citing *Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, 63 F.3d 1267, 1275 n.17 (3d Cir. 1995)).

[15]    *Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238 (3d Cir. 2016) (quoting Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment).

testify."[16] Here, Mill has not offered any explanation as to how the evidence he is submitting might be admissible at trial. Nevertheless, the Court is satisfied that, given the parties' knowledge of the out-of-court declarants' identities, Mill could call them to testify, and their out-of-court statements can therefore be considered on this motion for summary judgment.[17]

With these standards outlining the Court's framework for review, I now turn to the facts.

### C.    Background

#### 1.    Assault at the Saloon

On the evening of May 12, 2018, Brandon Peddigree and his girlfriend, Jordan Daubermen, went with some friends to shoot pool and socialize at the Riverside Saloon in Lock Haven, Pennsylvania.[18] Spencer Mill had the same idea,

---

[16]   *Id.* at 238-39; *see Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 600 (M.D. Pa. 2014) (potential admissibility may be "demonstrated by the proponent showing some likelihood that the declarant will appear and testify at trial." (quoting *Howley v. Experian Info. Sols., Inc.*, 813 F. Supp. 2d 629, 637 (D.N.J. 2011)).

[17]   If the declarants proved unavailable at trial, Mill would bear the burden of demonstrating the admissibility of their depositions. *James v. Tri-Way Metalworkers, Inc.*, 189 F. Supp. 3d 422, 432-33 (M.D. Pa. 2016) (quoting *Pittsburgh Press Club v. United States*, 579 F.2d 751, 758 (3d Cir. 1978)). The Court further notes that the reliability of Dauberman's voluntary statement and the statements attributed to Rickert and Quiggle is questionable given that none of these statements was sworn, *cf. United States ex rel. Doe v. Heart Sol., PC*, 923 F.3d 308, 315-16 (3d Cir. 2019) (holding that unsworn statement submitted in litigation was insufficient to create an issue of fact on summary judgment), and the Rickert and Quiggle statements additionally come to the Court as double hearsay. Nevertheless, because the hearsay statements of the out-of-court declarants in *Fraternal Order of Police* should have been considered despite being unsworn by the original declarant, the Court concludes that all of these statements can be considered. Ultimately, none of the unsworn hearsay statements independently creates a genuine dispute of material fact that would change the outcome of this opinion.

[18]   Doc. 22-4 (Peddigree Dep.) at 17:10-18:11.

as did Courtney Quiggle.[19] Although the latter two were friendly, they did not come to the Saloon together.[20] Quiggle was also friends with Dauberman and Peddigree, but neither Dauberman nor Peddigree was familiar with Mill.[21]

Quiggle arrived at the Saloon around 9:30 p.m.,[22] Peddigree and Daubermen followed at around 10:00 p.m.,[23] and Mill came last at around 11:00 p.m.[24] Peddigree was drinking, and estimated that over the course of six hours he consumed "close to ten beers," "close to ten shots[,] and a mixed drink or two in between."[25] As a result, he "do[es]n't remember a whole lot of the night."[26] The others were not drinking as heavily: Mill was "slightly buzzed,"[27] and Quiggle had "a total of four drinks throughout the entire evening."[28]

As closing time neared, Mill approached Quiggle at the bar, sat down to her right, and asked if she would be interested in joining him and his friends at his apartment.[29] According to Mill, his intent was purely friendly and entirely

---

[19]  Doc. 22-3 (Mill Dep.) at 17:5-14, 18:6-9.
[20]  *Id.* at 12:15-13:6.
[21]  *Id.* at 15:8-17, 16:19-23; Doc. 22-4 at 11:22-25, 12:12-21.
[22]  Doc. 23-19 (Quiggle Interview Notes) ¶ 3.
[23]  Doc. 22-4 at 18:3-5.
[24]  Doc. 22-3 at 17:23-24.
[25]  Doc. 23-12 (Earlier Action Peddigree Examination) at 22:1-7.
[26]  *Id.* at 22:10-14.
[27]  Doc. 22-3 at 30:18-21.
[28]  Doc. 23-19 ¶ 7.
[29]  Doc. 22-3 at 18:10-20:4, 21:6-25.

aromantic.[30] Their conversation lasted for around 20-30 minutes,[31] and, by the end, Quiggle was "open to coming back" with Mill.[32]

Dauberman was also at the bar, and was seated on Quiggle's left.[33] She remembers the conversation differently. According to Dauberman, Quiggle repeatedly refused Mill's requests to go to his apartment.[34] When Mill persisted, Dauberman interjected and told him to leave Quiggle alone.[35] In Dauberman's recollection, Mill did not take kindly to her interference and grabbed her thigh so hard that it bruised.[36] Dauberman cried out in pain, alerting her boyfriend, Peddigree, that Mill was hurting her.[37] Peddigree was sitting at the bar to Mill's right throughout the entire interaction.[38] When Dauberman called out, Peddigree told Mill to stop and—practically simultaneously—took the beer bottle that he was holding and used it to strike Mill in the head.[39] In the moment that he struck Mill,

---

[30]  *Id.* at 20:5-12.

[31]  *Id.* at 18:16-22.

[32]  *Id.* at 24:8-9.

[33]  *Id.* at 21:9-11.

[34]  Doc. 23-17 (Earlier Action Dauberman Dep.) at 21:19-22, 22:9-13; Doc. 23-16 (Criminal Action Dauberman Aff.) at 1.

[35]  Doc. 23-17 at 21:19-23.

[36]  *Id.* at 22:15-23:12; Doc. 23-16 at 1; Doc. 23-15 (Criminal Action Dauberman Voluntary Statement) at 1.

[37]  Doc. 23-17 at 21:23-22:1; Doc. 23-16 at 1; Doc. 23-15 at 1; Doc. 23-12 at 17:9-11, 19:4-7; Doc. 22-4 at 22:10-13, 23:6-9.

[38]  Doc. 23-12 at 19:19-22.

[39]  Doc. 23-12 at 17:9-18:4; Doc. 22-4 at 23:10-13, 30:8-23; Doc. 23-17 at 22:1-2.

Peddigree "blacked out."[40] Although he recalls Dauberman saying something, his only recollection of the attack is "hearing the glass break."[41]

Mill does not recall any precipitating event.[42] He denies touching, grabbing, threatening, or intimidating Dauberman.[43] He does not recall Dauberman intervening in his conversation with Quiggle and, in fact, believes that it may have been Dauberman's "intention . . . to join [Quiggle] if [she and Mill] were to leave together."[44] In Mill's words, he is "one hundred percent" certain that he does now and has always believed that "Mr. Peddigree did not strike [him] accidentally [and]

---

[40]    Doc. 22-4 at 22:10-13.

[41]    Doc. 23-12 at 18:22-24; *see id.* at 17:5-19:7; Doc. 22-4 at 23:6-25:6 ("Q. So you remember being at the bar; you remember dealing with the bartender, and you remember Jordan saying something? A. Yes. Q. What's the next thing you remember? A. They were throwing me out the door, telling me to leave. Q. Do you remember going to the floor with Spencer Mill? . . . A. No, I don't remember."); Doc. 23-13 (Earlier Action Peddigree Dep.) at 28:8-15 ("I remember sitting at the bar, and I think Jordan was trying to pay her tab, and I was just sitting there. I believe I was speaking to someone on my right but I don't recall who and that's when I like heard her yell out to me that he was hurting her and stuff and then I guess I picked the bottle up and that's when I hit him I guess to try to get him to stop.").

[42]    Doc. 22-3 at 27:25-28:3 ("Q. Was there any warning or indication that something might happen, such as the assault that occurred? A. No."); *id.* at 30:6-9 ("Q. Did you hear Jordan Dauberman saying anything out loud prior to being struck with the bottle? A. No.").

[43]    *Id.* at 24:25-25:24 ("Q. If someone said that you grabbed [Dauberman], that would be true or would that be false? A. That would be false. Q. If someone said that you were hurting her, would that be true or would that be false? A. No, that would be false."); *id.* at 29:4-21 ("A. After the accusation came out, that I had grabbed [Dauberman]'s leg, [Quiggle] had said she doesn't remember that ever happening. . . . Q. Okay. You were certain it did not happen, is that true? A. I am myself, yes, certain, it did not happen. Q. Okay. So if we were in a courtroom right now, in front of a judge at a trial, you would absolutely testify you did absolutely nothing to touch, approach, threaten, or intim[id]ate Jordan Dauberman prior to your being struck by Mr. Peddigree? A. Yes.").

[44]    *Id.* at 23:4-18.

. . . that there was absolutely no reason for [Peddigree] to strike [him], [and] that he w[as]n't doing anything to anybody."[45]

After Peddigree hit Mill with the bottle, the two ended up on the floor.[46] When Mill regained consciousness, Peddigree was holding him around the neck, "choking" him.[47] Peddigree was eventually pulled off of Mill and thrown out of the Saloon.[48] According to Peddigree, his friends told him what he had done once they were outside.[49] Shortly thereafter, Peddigree got a ride to the police station and turned himself in.[50]

Peddigree was charged in the Court of Common Pleas of Clinton County, Pennsylvania with aggravated assault,[51] simple assault,[52] recklessly endangering another person,[53] harassment by physical contact,[54] and disorderly conduct for

---

[45] *Id.* at 34:19-35:8; *see id.* at 26:21-28:9 ("Q. Was there any need for anybody to intervene, in any way, to provide assistance to protect anyone from you? A. No." . . . "Q. Do you believe there was any reason for anyone to strike or hit you? A. No. Q. Do you believe there was any reason at all for anyone to even confront you verbally about what was going on between yourself, Courtney Quiggle and/or Jordan Dauberman? A. No.").

As the Court's analysis will make clear, a jury that believed Mill's testimony would likely have a difficult time ruling in his favor. Nationwide did not argue that Mill's statements should be considered binding admissions of fact, so the Court does not treat them as such. *See Coleman v. Wyeth Pharms., Inc.*, 6 A.3d 502, 524-26 (Pa. Super. Ct. 2010) (discussing rule of judicial admissions). At trial, Nationwide will be free to confront Mill with his self-sabotaging assertions. *Id.* at 526.

[46] Doc. 22-3 at 31:20-23.

[47] *Id.*; *see id.* at 32:1-3 ("Q. So he continued to assault you even though you were unconscious? A. Yes.").

[48] Doc. 22-4 at 23:18-20; Doc. 22-3 at 31:20-23.

[49] Doc. 22-4 at 27:2-14.

[50] *Id.* at 26:18-28:9.

[51] 18 Pa. Cons. Stat. § 2702(a)(4).

[52] 18 Pa. Cons. Stat. § 2701(a)(2).

[53] 18 Pa. Cons. Stat. § 2705.

fighting.[55] He eventually pled guilty to simple assault and reckless endangerment, and the other charges against him were dismissed.[56] He was sentenced to 1-2 years in prison, 2 years of probation, and fines.[57] Mill came away from the assault with a large corneal laceration to his right eye, resulting in prolapsed uveal tissue, a prolapsed lens, and prolapsed vitreous.[58]

### 2.    Civil Suit and Nationwide Insurance Policy

At the time of the assault, Peddigree's parents held homeowners and umbrella insurance policies with Nationwide, under which Peddigree was insured.[59] So when Mill sued Peddigree to recover damages for his injuries,[60] Peddigree filed claims pursuant to both policies for a defense and, if necessary, indemnity. Nationwide denied his claim under the homeowners policy, reasoning that its coverage exclusion for liability for bodily injury "caused by or resulting from an act or omission which is criminal in nature and committed by an insured" operated to bar coverage.[61] Mill does not challenge this denial. Nationwide initially provided Peddigree with a defense pursuant to the umbrella policy, but reserved its

---

[54]  18 Pa. Cons. Stat. § 2709(a)(1).
[55]  18 Pa. Cons. Stat. § 5503(a)(1); *see* Doc. 23-6 (Criminal Docket Sheet) at 3.
[56]  Doc. 23-6 at 3.
[57]  *Id.* at 3-4.
[58]  *See* Doc. 1-1 (Compl.) ¶¶ 11-13.
[59]  Doc. 22-2 (Nationwide Umbrella Policy) at D1 (defining "insured" as "any of the following who live in your household: (1) your relatives").
[60]  *See Mill v. Peddigree*, No. 548-2020 (Pa. Ct. C.P. Clinton Cnty. 2020).
[61]  Doc. 28-7 (Nationwide Homeowners Denial Letter).

rights "not to indemnify" and "to withdraw the defense being provided."[62] And a few months later, Nationwide exercised its rights, ordered its attorney to withdraw, and denied coverage under the umbrella policy.

The umbrella policy ("the policy") provides, in relevant part, that Nationwide "will pay for damages an insured is legally obligated to pay due to an **occurrence** in excess of: a) the retained limit; plus, b) any other liability insurance available to an insured which applies to an **occurrence**."[63] An "occurrence" is defined as "an accident including continuous or repeated exposure to the same general conditions . . . [that] result[s] in bodily injury, property damages, or personal injury caused by an insured."[64] The policy includes a coverage exclusion for "[b]odily injury, property damage and personal injury caused intentionally by or at the direction of an insured, including willful acts the result of which the insured knows or ought to know will follow from the insured's conduct" (the "intentional-acts exclusion").[65] However, that exclusion contains an exception for "bodily injury or property damages caused by an insured trying to protect person or property" (the "self-defense exception").[66]

---

[62] Doc. 23-7 (Nationwide Umbrella Tentative Coverage Letter) at 3.
[63] Doc. 22-2 at C1 (some original bolding omitted).
[64] *Id.* at D1.
[65] *Id.* at E1.
[66] *Id.*

Neither Peddigree nor Mill was particularly happy about Nationwide's exit from the case.[67] Notably, however, no party attempted to have the coverage question definitively decided during the pendency of the state civil litigation. Nationwide did not pursue a declaratory judgment that Peddigree's acts were not covered, and Peddigree did not bring claims for duty to defend or indemnify. Instead, everyone appears to have taken the easiest way out in the moment. Nationwide simply walked away, daring its insured to sue for coverage. Peddigree and Mill, apparently acknowledging that without insurance Peddigree would be unable to pay what was likely to be a substantial damages award, settled with the stipulation that Mill would only attempt to recover the judgment to which they agreed—$650,000—from Nationwide in exchange for the assignment of Peddigree's right to seek coverage.[68] The Clinton County Court of Common Pleas approved the settlement and entered judgment on April 13, 2023.[69]

### 3.    Present Case

Mill exercised his newly acquired rights immediately. He sued Nationwide in the Clinton County Court of Common Pleas on April 18, 2023, seeking a

---

[67]    *See* Doc. 23-10 (Settlement Agreement) ("Mill and Peddigree believe that the conduct of Nationwide is wrongful and violates the principles of good faith and fair dealing under Pennsylvania law and breaches the umbrella policy.").

[68]    *Id.*

[69]    Doc. 23-11 (Order Approving Settlement).

declaratory judgment that Nationwide owed a duty of indemnity to Peddigree—and, through the settlement, to him—under the umbrella policy.[70]

Nationwide removed the case to this Court on June 1, 2023, invoking federal diversity jurisdiction[71] and contending that the amount-in-controversy requirement of $75,000 was constructively met by the existence of the $650,000 judgment.[72] The parties conducted discovery and their cross-motions for summary judgment are currently pending.

## D.    Conduct of Litigation

Before turning to the legal analysis, the Court must note that this litigation is something of a mess. When an insurance company believes that it has no duty to defend or indemnify an insured for a particular claim that is the subject of litigation between the insured and a third party, the insurer should use Pennsylvania's declaratory judgment procedure "to resolve the question of coverage to eliminate uncertainty."[73] "[A]n insurer's duty to defend is triggered, if at all, by the factual

---

[70]   Doc. 1-1.

[71]   28 U.S.C. § 1332(a).

[72]   Doc. 1 (Notice of Removal). The Court agrees that the amount-in-controversy requirement is satisfied. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 347 (1977) ("In actions seeking declaratory judgment . . . the amount in controversy is measured by the value of the object of the litigation.").

[73]   *Am. & Foreign Ins. Co. v. Jerry's Sport Center, Inc.*, 2 A.3d 526, 542 (Pa. 2010) ("*Jerry's Sport Center II*"); *Selective Way Ins. Co. v. Hosp. Grp. Servs., Inc.*, 119 A.3d 1035, 1048 (Pa. Super. Ct. 2015) (en banc) ("[A]ccording to our Supreme Court, if an insurance company is uncertain about its duty to defend an insured in a third party's action, it is expected and anticipated that the insurance company will bring a declaratory judgment action concerning its duty to defend prior to denying coverage to an insured." (citing *Jerry's Sport Center II*, 2 A.3d at 542)); *see Stidham v. Millvale Sportsmen's Club*, 618 A.2d 945, 954 (Pa. Super. Ct. 1992) ("Aetna did not, however, pursue the available declaratory judgment procedure at the

averments contained in the complaint [against the insured] itself."[74] "[T]he obligation to defend arises whenever the complaint filed by the injured party *may potentially* come within the coverage of the policy."[75] "An insurer's duty to indemnify is narrower than its duty to defend,"[76] and "arises only when the insured is determined to be liable for damages within the coverage of the policy."[77]

Thus, in the normal case, a declaratory judgment action will clarify at the outset whether insurance coverage may be possible for the injuries alleged in a lawsuit against an insured. If there is any chance that the harm could be covered, the insurer must provide a defense in the underlying suit. The underlying suit progresses, and, if it results in a verdict against the insured on claims that are covered under the policy, the insurer has a duty to indemnify and must pay the damages (to the extent the policy provides). If the harm could not be covered, the insurer is free to deny coverage. This framework optimizes the litigation process. The injured party will have a general idea of whether the suit is worthwhile—if

---

outset in order to definitively determine its duty to defend McLaughlin. A declaratory judgment action, though not specifically required by law, might have resolved at the outset the question of Aetna's duty to defend.").

[74] *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Com. Union Ins. Co.*, 908 A.2d 888, 896 (Pa. 2006).

[75] *Am. & Foreign Ins. Co. v. Jerry's Sport Center*, 948 A.2d 834, 845 (Pa. Super. Ct. 2008) ("*Jerry's Sport Center I*"), *aff'd* 2 A.3d 526 (Pa. 2010) (quoting *Wilcha v. Nationwide Mut. Fire Ins. Co.*, 887 A.2d 1254, 1258 (Pa. Super. Ct. 2005)) (original emphasis omitted and new emphasis added).

[76] *Main St. Am. Assurance Co. v. Howard Lynch Plastering, Inc.*, 585 F. Supp. 3d 737, 743 (E.D. Pa. 2022) (citing *Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 673 (3d Cir. 2016)).

[77] *QBE Ins. Corp. v. Walters*, 148 A.3d 785, 788 (Pa. Super. Ct. 2016) (quoting *Selective Way*, 119 A.3d at 1046).

there is no coverage and the insured is judgment-proof, it is not. The insurer will know whether it may be required to indemnify and can choose between litigation or settlement, and if seeking settlement, can negotiate on reasonable terms. And, if the case proceeds to trial, a jury can gauge the insured's actions on the well-worn ground of tort law, render a verdict, and determine a fair amount of damages.

This case, on the other hand, has gone backwards. When Nationwide "cavalier[ly]" exited the underlying litigation,[78] the parties' incentives changed and Peddigree agreed to a pricey settlement knowing that he would never have to pay it. Peddigree's actual liability was never litigated in that suit.[79] Now, with a sum certain hanging like an anvil overhead, the parties are finally reaching the question of whether Nationwide might have an obligation to its insured *more than six years* after Peddigree hit Mill. A jury considering Peddigree's liability will have to sift through an evidentiary record obscured by the fog of intoxication and then eroded by years of time to determine what was in Peddigree's mind in the moment he acted. That is not how cases like this should proceed, and Nationwide must bear the consequences of its actions.[80]

---

[78]  *Stidham*, 618 A.2d at 955.

[79]  *See* Doc. 22-5 (Underlying Complaint) ¶¶ 21-31; Doc. 23-10 ¶ 1 (stating generally that settlement was "based upon facts set forth in Mill's amended complaint").

[80]  *See Stidham*, 618 A.2d at 955 ("Aetna's cavalier approach to the legal proceedings, based on its independent decision not to participate, was risky. Aetna had the opportunity to litigate the issue of McLaughlin's intent and must, therefore, be bound by the findings that those actions were both negligent and the legal cause of Brett Stidham's death.").

### E.    Analysis

In his motion for summary judgment, Mill argues that Peddigree's actions should be covered by the umbrella policy because he was acting in defense of Dauberman when he struck Mill.[81] Thus, according to Mill, the self-defense exception to the intentional-acts exclusion applies, and Peddigree's acts are covered.[82] Mill additionally argues that Peddigree's actions were not intentional because he was intoxicated at the time.[83]

In its motion for summary judgment, Nationwide argues that Peddigree's actions are not covered by the umbrella policy for two primary reasons. First, it contends that, because he intentionally swung the bottle at Mill, his actions were not an "accident" and thus there was no "occurrence" to trigger coverage in the first place.[84] Second, if the assault could be considered an "occurrence," the intentional acts exclusion applies to bar coverage because Peddigree intended to injure Mill.[85] Nationwide argues that the self-defense exception is inapplicable for two reasons: (1) Peddigree's guilty plea in the criminal action estops him from claiming defense of another; and (2) the facts in the record demonstrate beyond dispute that Peddigree was not acting in defense of another.[86]

---

[81]    Doc. 25 at 14-18.
[82]    *Id.*
[83]    *Id.* at 18-22.
[84]    Doc. 17 at 4-8.
[85]    *Id.* at 8-11.
[86]    *Id.* at 12-18.

In analyzing Nationwide's duties to defend and to indemnify, the Court must determine whether Peddigree's actions could fall within the scope of the umbrella policy's coverage.[87]

### 1.    The Umbrella Policy

The parties agree that Pennsylvania law governs the umbrella policy. "When interpreting insurance policies, '[a court] must apply general principles of contract interpretation, as, at base, an insurance policy is nothing more than a contract between an insurer and an insured.'"[88] A court's duty is to "ascertain the intent of the parties as manifested by the terms used in the written insurance policy. Just as in statutory construction, when the language of the policy is clear and unambiguous, a court is required to give effect to that language."[89] "When terms in a contract are not defined, [a court] must construe the words in accordance with their natural, plain, and ordinary meaning," which can be determined by reference to "statutes, regulations or the dictionary."[90]

Whether Peddigree may enjoy insurance coverage in this case of intoxicated defense of another raises questions that implicate the central purposes of insurance.

---

[87]  *Ramara*, 814 F.3d at 673 (citing *Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 226 (3d Cir. 2005)); *Selective Way*, 119 A.3d at 1046 (quoting *Regis Ins. Co. v. All. Am. Rathskeller, Inc.*, 976 A.2d 1157, 1161 (Pa. Super. Ct. 2009)).

[88]  *Erie Ins. Exch. v. Backmeier*, 287 A.3d 931, 946 (Pa. Super. Ct. 2022) (quoting *Gallagher v. Geico Indem. Co.*, 201 A.3d 131, 137 (Pa. 2019)).

[89]  *Id.* (quoting *Gallagher*, 201 A.3d at 137).

[90]  *Nazareth Mut. Ins. Co. v. Pa. Ins. Dep't*, 298 A.3d 140, 151 (Pa. Commw. Ct. 2023) (quoting *Cordero v. Potomac Ins. Co. of Ill.*, 794 A.2d 897, 900 (Pa. Super. Ct. 2002) and *Atiyeh v. Bd. of Comm'rs of Twp. of Bethlehem*, 41 A.3d 232, 236-37 (Pa. Commw. Ct. 2012)).

"One of the fundamental assumptions deeply embedded in insurance law is the principle that an insurer will not pay for a loss unless the loss is 'fortuitous,' meaning that the loss must be accidental in some sense."[91] From this core tenet stem the contractual provisions in this contract: "occurrence" is explicitly defined as an "accident";[92] the intentional-acts exclusion is designed to prevent the insured from recovering for losses that he deliberately brought about (i.e., that were not fortuitous);[93] and the self-defense exception provides solace for an insured who acts intentionally, but does so innocently and in response to an unexpected (i.e. fortuitous) situation.[94] Intoxication affects the insured's mental state, and therefore may bear on whether events are fortuitous from his perspective.[95] Pennsylvania courts' existing interpretations of these standard terms and concepts bear out the central role of the principle of fortuity.

---

[91] 1 Robert H. Jerry, II, *New Appleman on Insurance Law Library Edition* § 1.05(2)(a) (2024); *see Auto-Owners Ins. Co. v. Stevens & Ricci, Inc.*, 835 F.3d 388, 405-06 (3d Cir. 2016) (quoting *United Servs. Auto. Ass'n v. Elitzky*. 517 A.2d 982, 986 (3d Cir. 2016)).

[92] Doc. 22-2 at D1; *see* 1 *Appleman* § 1.05(2)(a); *Kvaerner*, 908 A.2d at 899.

[93] 1 *Appleman* § 1.05(2)(a); *see State Farm Fire & Cas. Co. v. DeCoster*, 67 A.3d 40, 49-50 (Pa. Super. Ct. 2013).

[94] *DeCoster*, 67 A.3d at 49-50 (Insurance's purposes "[are] not served by interpreting [an intentional-acts exclusion] to exclude coverage in self-defense situations where the insured is not acting by conscious design but is attempting to avoid a 'calamity' which has befallen him." (quoting *Transamerica Ins. Grp. v. Meere*, 694 P.2d 181, 186 (Ariz. 1984) (in banc))).

[95] *See Stidham*, 618 A.2d at 563; *State Farm Fire & Cas. Co. v. Estate of Mehlman*, 589 F.3d 105, 112 (3d Cir. 2009).

### a.    Occurrence

The policy defines an "occurrence" as "an accident including continuous or repeated exposure to the same general conditions . . . [that] result[s] in bodily injury, property damages, or personal injury caused by an insured."[96]

The Pennsylvania Supreme Court interpreted an insurance policy containing an essentially identical definition of "occurrence" in *Donegal Mutual Insurance Company v. Baumhammers*.[97] The *Baumhammers* court explained that:

> [T]he term "accident" within insurance policies refers to an unexpected or undesirable event occurring unintentionally, and . . . the key term in the definition of the "accident" is "unexpected," which implies a degree of *fortuity*. An injury therefore is not "accidental" if the injury was the natural and expected result of the insured's actions.[98]

The court explained that whether a situation is an "accident" is to be determined "from the perspective of the insured."[99] It then went on to conclude that the injuries resulting from the insureds' son going on a shooting spree (which was undisputedly intentional) could be considered "accidental" under the policy because, from the insureds' perspective, the massacre was "extraordinary" and "so

---

[96] Doc. 22-2 at D1.

[97] 938 A.2d 286, 289 (Pa. 2007) ("The policy defines an 'occurrence' as an 'accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period in ... [b]odily injury or [p]roperty damage.'").

[98] *Id.* at 292 (emphasis added).

[99] *Id.* at 293; *see id.* at 291-92 (citing *Mohn v. Am. Cas. Co. of Reading*, 326 A.2d 346, 348 (Pa. 1974)).

unexpected, undesigned, and fortuitous," that it "[could not] be said to be the natural and expected result of Parents [sic] alleged acts of negligence."[100]

Because the definition of "occurrence" in *Baumhammers* matches the same in this present contract, the *Baumhammers* interpretation controls, and requires the Court to determine whether Peddigree could have understood and expected the injury he caused.

### b.    Intentional Acts Exclusion

The policy states that "bodily injury, property damage and personal injury caused intentionally or at the direction of an insured, including willful acts the result of which the insured knows or ought to know will follow from the insured's conduct" are excluded from coverage.[101]

The Pennsylvania Superior Court provided an oft-cited interpretation of an intentional-acts exclusion in *United Services Automobile Association v. Elitzky*.[102] The *Elitzky* court explored other states' approaches to exclusionary clauses like the one at issue and found them divergent.[103] Despite differing interpretations, however, "[t]he vast majority of courts hold that the clause precludes coverage if the insured acted with the specific intent to cause some kind of bodily injury or

---

[100]  *Id.* at 293.
[101]  Doc. 22-2 at E1.
[102]  517 A.2d 982, 985 (Pa. Super. Ct. 1986) ("Medical Payments to others do not apply to bodily injury or property damage . . . [w]hich is expected or intended by the insured."); *see, e.g.*, *Wiley v. State Farm Fire & Cas. Co.*, 995 F.2d 457, 460-61 (3d Cir. 1993) (discussing *Elitzky*, 517 A.2d 982).
[103]  *Elitzky*, 517 A.2d at 986.

damage."[104] But analyses further split within the specific intent camp,[105] and the court therefore concluded "as a matter of law" that intentional-acts exclusionary clauses "are ambiguous and must be construed against the insurer."[106]

Having found the exclusion ambiguous, the *Elitzky* court proceeded to interpretation. It began from the understanding that:

> Pennsylvania law is clear on at least one of the issues involved. In our state, the exclusionary clause only applies when the insured intends to cause a harm. Insurance coverage is not excluded because the insured's actions are intentional unless he also intended the resultant damage. The exclusion is inapplicable even if the insured should reasonably have foreseen the injury which his actions caused.[107]

After reviewing several cases developing this "specific intent" principle, the *Elitzky* court settled on a "same general type" approach to covered harms:

> [W]e hold that an intended harm exclusionary clause in an insurance contract is ambiguous as a matter of law and must be construed against the insurer. We hold that such a clause excludes only injury and damage of the same general type which the insured intended to cause. An insured intends an injury if he desired to cause the consequences of his act or if he acted knowing that such consequences were substantially certain to result.[108]

---

[104] *Id.* (citing *Pachucki v. Republic Ins. Co.*, 278 N.W.2d 898 (Wis. 1979)). The minority view takes a "general intent" approach, holding that "when an intentional act results in injury which is a natural and probable consequence of that act, the injuries are excluded from coverage." *Id.* (citing *Argonaut Sw. Ins. Co. v. Maupin*, 500 S.W.2d 633 (Tex. 1973)).

[105] *Id.* at 986-87 (describing three theories for what type of harm will be covered: (1) any that resulted when some harm was intended; (2) only that which was specifically intended; or (3) resultant harm "of the same general type" as that which was intended).

[106] *Id.* at 987 (citing *Erie Ins. Exch. v. Transamerica Ins. Co.*, 507 A.2d 389, 392 (Pa. Super Ct. 1986)).

[107] *Id.* (citing *Mohn*, 326 A.2d 346).

[108] *Id.* at 989 (citing *Nationwide Mut. Ins. Co. v. Hassinger*, 473 A.2d 171, 175 (Pa. Super. Ct. 1984)).

As a corollary, an intentional-acts exclusion will not preclude coverage when the insured has acted recklessly or negligently.[109] Reasoning further, the *Elitzky* Court also determined that the use of the term "expected" in the exclusionary clause was ambiguous, and that it should be interpreted as "synonymous [with the term 'intentional'] for purposes of insurance exclusionary clauses."[110]

Nationwide agrees that the *Elitzky* definition of an intentional-acts exclusion controls the analysis in this case,[111] so the Court will apply it.[112] The Court will determine whether Peddigree acted with the intent to cause an injury of the same general type that resulted.

---

[109] *Id.* at 989-90 (distinguishing intent from recklessness); *Erie Ins. Exch. v. Moore*, 228 A.3d 258, 266 (Pa. 2020) (holding that conduct pled as "negligence, carelessness and recklessness" was beyond the scope of intentional-acts exclusion); *Erie Ins. Exch. v. Fidler*, 808 A.2d 587, 590 (Pa. Super. Ct. 2002) ("Simple negligence or even recklessness would not be excluded under [an intentional-acts exclusion]." (citing *Elitzky*, 517 A.2d at 991)).

[110] *Elitzky*, 517 A.2d at 990-92.

[111] Doc. 17 at 8-9.

[112] The Court notes that the intentional-acts exclusion in *Elitzky* did not include the instant policy's language excluding "willful acts the result of which the insured knows or ought to know will follow from the insured's conduct." *See* Doc. 22-2 at E1. Nationwide affirmatively relies on *Elitzky* and offers no argument that this additional clause alters the *Elitzky* interpretation, so any argument to that effect is waived. *Hayes v. Silvers, Langsam & Weitzman, P.C.*, 441 F. Supp. 3d 62, 66 n.4 (E.D. Pa. 2020) (declining to consider arguments not raised in primary briefing (citing *Laborers' Int'l Union of N. Am. v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994))). This issue may be an important one. *See Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828 (Tex. 2009) (interpreting "willful" clause); *Nationwide Mut. Ins. Co. v. Finkley*, 679 N.E.2d 1189 (Ohio Ct. App. 1996) (same). But it is not well-suited for a federal court to determine in the first instance with no briefing.

### c.    Self-Defense Exception

The policy states that its intentional-acts exclusion "does not include bodily injury or property damage caused by an insured trying to protect person or property."[113]

Unlike the prior provisions, there does not appear to be a definitive interpretation of a self-defense exception to an intentional-acts exclusion under Pennsylvania law. Therefore, the Court must predict how the Pennsylvania Supreme Court would resolve the issue, considering "(1) what that court has said in related areas; (2) the decisional law of the state intermediate courts; (3) federal cases interpreting state law; and (4) decisions from other jurisdictions that have discussed the issue."[114] Given the exception's inclusion in the intentional-acts exclusion that Pennsylvania courts have held is ambiguous as a matter of law, the Court concludes that this phrase is also ambiguous, and therefore should be "construed in favor of the insured and against the insurer."[115] Proceeding from this ambiguity, the Court's interpretation is guided by Pennsylvania courts' understanding of the impact of self-defense on insurance coverage in the public policy context.

---

[113]  Doc. 22-2 at E-1.

[114]  *Ill. Nat'l Ins. Co. v. Wyndham Worldwide Operations, Inc.*, 653 F.3d 225, 231 (3d Cir. 2011) (citing *Canal Ins. Co. v. Underwriters at Lloyd's London*, 435 F.3d 431, 436 (3d Cir. 2006)).

[115]  *Wolfe v. Ross*, 115 A.3d 880, 884 (Pa. Super. Ct. 2015) (citing *Penn-America Ins. Co. v. Peccadillos, Inc.*, 27 A.3d 259, 265 (Pa. Super. Ct. 2011) (en banc)).

In *State Farm Fire and Casualty Co. v. DeCoster*, the Pennsylvania Superior Court considered whether an insured should be covered when he intended to harm the injured party, but did so in what he believed was self-defense.[116] There, the insured (DeCoster), after consuming alcohol and not wearing his glasses, mistakenly believed that his guest was an intruder when she came back inside from smoking a cigarette.[117] DeCoster chased her through the house and eventually shot her.[118] Because the evidence showed that DeCoster "intended to shoot who he believed to be a small male intruder," the policy's intentional-acts exclusion did not automatically preclude coverage.[119] The court explained that, because "the critical inquiry is whether the conduct which led to the act was intentionally wrongful from the viewpoint of the law of torts," "if the insured produces facts that can establish privilege (as in a sports injury case) or under a claim of right recognized by law (as in self-defense), the insured's subjective intent can be explained, and it is then within the realm of the fact finder to determine whether the insured intended to *wrongfully* injure."[120]

Based on the discussed case law interpreting the "occurrence" and intentional-acts exclusion provisions, along with *DeCoster* and the contractual structure and language, the Court concludes that the Pennsylvania courts would

---

[116]  67 A.3d 40 (Pa. Super. Ct. 2013).
[117]  *Id.* at 42.
[118]  *Id.*
[119]  *Id.* at 42-43, 49-50.
[120]  *Id.* at 49 (citing *Meere*, 694 P.2d at 189) (emphasis added).

interpret the self-defense exception to apply in any case where the insured's overriding intent in causing an injury was defense of himself, another, or property.[121] When such a situation arises, the insured lacks the requisite intent to cause harm that would bar coverage under *Elitzky*. This interpretation is necessary to give effect to the self-defense exception's inclusion within the intentional-acts exclusion (which, as explained, focuses solely on specific intent to cause harm). Moreover, this focus on intent gives effect to the language covering an insured "*trying* to protect person or property."[122]

Importantly, because the self-defense exception, like the intentional-acts exclusion, focuses on the insured's subjective intent,[123] whether the insured's use of force is objectively necessary or disproportionate cannot automatically be dispositive of coverage. Although mistaken or disproportionate use of force may be strong evidence that the insured's intent was not to defend, those facts must be considered along with all other evidence of intent to determine whether the insured had a subjective belief that defense was necessary and, thus, innocent intent.[124]

---

[121] *See Meere*, 694 P.2d at 189 (explaining that an insured acting in self-defense does not "necessarily have a primary desire to injure the victim").

[122] Doc. 22-2 at E1 (emphasis added).

[123] *Minnesota Fire & Cas. Co. v. Greenfield*, 855 A.2d 854, 863 (Pa. 2004) (quoting *Wiley v. State Farm Fire & Cas. Co.*, 995 F.2d 457, 461 (3d Cir. 1993)); *Aetna Life & Cas. Co. v. Barthelemy*, 33 F.3d 189, 191 (3d Cir. 1994) ("*Elitzky* mandates a 'subjective intent' analysis for determining coverage under an exclusionary clause in most Pennsylvania insurance cases . . . ." (citing *Wiley*, 995 F.2d at 460).

[124] *See DeCoster*, 67 A.3d at 49; *Meere*, 694 P.2d at 189 ("If the jury finds that Meere acted in self-defense with no basic desire or intent to harm Pruitt, but negligently used force greater

Putting the issue in fortuity terms further confirms the Court's interpretation. An insured who acts in self-defense will not have controlled the circumstances in order to bring about the situation requiring such conduct.[125] In that sense, the injury resulting from the insured's self-defense is fortuitous and accidental: the insured did not expect or consciously create the threat that forced him to act.[126]

*    *    *

Zooming back out to fortuity, the preceding discussion elucidates the conclusion that the contract's occurrence provision introduces the general concept of fortuity, while the intentional-acts exclusion and the self-defense exception help to clarify its contours and act as helpful shortcuts for established situations in which an injury is or is not fortuitous.[127] Because of the interplay between the

---

than necessary in self-defense, Meere may be liable for damages to Pruitt. In such an event, the true situation is one of negligence.").

[125] *See Vermont Mut. Ins. Co v. Walukiewicz*, 966 A.2d 672, 679-80 (Conn. 2009) ("[I]t seems equally plausible to characterize actions taken in self-defense as, by their very nature, instinctive or reactive and, accordingly, unplanned and unintentional." (citing *State Farm Fire & Cas. Co. v. Poomaihealani*, 667 F. Supp. 705, 708 (D. Haw. 1987))); *id.* at 678-79 (collecting cases regarding split of authority on the issue).

[126] *DeCoster*, 67 A.3d at 49 ("[I]n self-defense situations . . . the insured is not acting by conscious design but is attempting to avoid a 'calamity' which has befallen him." (quoting *Meere*, 694 P.2d at 189)); *see Stevens & Ricci*, 835 F.3d at 406 n.23 (discussing *Meere*); 5 *Appleman* § 53.06(2)(b)(i); *State Farm Fire & Cas. Co. v. McAnany*, No. 87-CV-2069, 1988 U.S. Dist. LEXIS 7239, at *8 (D. Kan. June 13, 1988) ("When an insured acts in self-defense, he is not consciously controlling the risks covered by the policy."); *Stoebner v. S. Dakota Farm Bureau Mut. Ins. Co.*, 598 N.W.2d 557, 559-60 (S.D. 1999) ("A genuine claim of self-defense is consistent with 'accident' in that it is an event which must be by definition 'an undesigned, sudden, and unexpected event . . . and often accompanied by a manifestation of force.'" (quoting *Taylor v. Imp. Cas. & Indem. Co.*, 144 N.W.2d 856, 858 (1966))).

[127] *See Estate of Mehlman*, 589 F.3d at 111 ("Courts interpreting 'occurrence' policies have split on whether they should analyze the insured's intent as part of the insured's prima facie case

contractual provisions, the Court concludes that, in this case, the specific analytical approaches for each are not particularly useful.[128] When considering a complicated scenario, attempting to fit the interwoven facts of a single momentary incident into different and specific legal frameworks risks losing sight of their synergistic import. Each fact must inform every other to correctly determine whether the injury was fortuitous, and, therefore, should be covered. So the Court will approach the question considering the totality of the circumstances and keeping the above principles in mind to determine whether a jury could find that Mill's injury was expected or intended (i.e. fortuitous) from Peddigree's perspective.

### d.    Intoxication

One more legal issue is at play in this case, because here, Peddigree was drunk. Pennsylvania law counsels that "imbibed intoxicants must be considered in determining if the actor has the ability to formulate an intent."[129] There is no firm guiding principle to determine what level of intoxication is sufficient to render an

---

of demonstrating that there was an accident, or as part of the insurer's burden to demonstrate that the exclusion for intentional conduct is applicable."); *Walukiewicz*, 966 A.2d at 680 (holding that "the term 'accident,' and, hence, the term 'occurrence,' encompasses actions taken by an insured in legitimate self-defense"); *Stoebner*, 598 N.W.2d at 559-60 (reasoning that self-defense may be covered as an "occurrence") (quoting *Taylor*, 144 N.W.2d at 858)).

[128] The Court is not abandoning the legal approaches: I am merely recognizing that they are closely interrelated such that separate analyses may not be helpful in a particular case.

[129] *Stidham*, 618 A.2d at 953 (citing *Hassinger*, 473 A.2d at 176).

insured unable to form intent. The Third Circuit has instructed that it is high.[130] But ultimately, the issue of intoxication simply becomes another factor to be considered, along with other "indicia of intent," in the totality of the circumstances bearing on whether the insured acted intentionally,[131] and, by necessary extension, whether the injury at issue was an "occurrence."[132]

With these principles in mind, the Court turns to Nationwide's duties to defend and indemnify.

### 2.    Duty to Defend

As stated, an insurer has a duty to defend its insured when, "accept[ing] all of the allegations contained in the third party's complaint as true[,] . . . there is a *chance* that the injury alleged could *potentially* fall within the scope of the

---

[130] *Mehlman*, 589 F.3d at 114-15 ("Pennsylvania courts will not lightly allow an insured to avoid the financial repercussions of an act of violence by drinking himself into insurance coverage." (citing *State Farm Mut. Auto. Ins. Co. v. Martin*, 660 A.2d 66 (Pa. Super. Ct. 1995))).

[131] *See id.* at 112-14, 115 (discussing the evidence surrounding drunken incidents in several cases and stating that "indicia of intent—including an insured's intoxication—[are] merely . . . factor[s] that a court should consider in determining whether the insured intended to cause the results of his or her actions").

[132] *See Mehlman*, 589 F.3d at 111-15 (performing an "occurrence" analysis but only considering the question of whether the insured's act was intentional); *Homesite Ins. Co. ex rel. Ins. Couns. Inc. v. Neary*, 341 F. Supp. 3d 468, 473-74 (E.D. Pa. 2018) (performing an "occurrence" analysis but considering intoxication and its effect on insured's intent); *cf. Am. Nat. Prop. & Cas. Co. v. Hearn*, 93 A.3d 880, 886-87 (Pa. Super. Ct. 2014) (holding that intentional act was, by necessary implication, not an "occurrence").

policy."[133] The duty is thus very broad and "persists until an insurer can limit the claims such that coverage is *impossible*."[134]

Here, Nationwide had a duty to defend. Looking to Mill's amended complaint,[135] he clearly alleges that "Peddigree was . . . negligent, careless, and reckless . . . [in] using a glass bottle to strike Plaintiff on the forehead."[136] Mill also pointed out additional facts that could bring Peddigree's act within the scope of the umbrella policy's occurrence provision and outside the intentional-acts exclusion, including that "Peddigree may assert defense of himself or defense of others," and that "alcohol consumption affected his actions/judgment."[137] Given the above discussion of the umbrella policy's provisions, if a jury found these assertions to be true and returned a negligence verdict in Mill's favor, it is at least reasonably likely that a court would determine that the finding of liability came within the scope of the umbrella policy.[138] Accordingly, Nationwide had a duty to defend Peddigree.

---

[133] *Selective Way*, 119 A.3d at 1046 (citing *Jerry's Sport Center II*, 2 A.3d at 541) (emphasis added).

[134] *Id.* (quoting *Lexington Ins. Co. v. Charter Oak Fire Ins. Co.*, 81 A.3d 903, 911 (Pa. Super. Ct. 2013)) (emphasis added).

[135] *Kvaerner*, 908 A.2d at 896.

[136] Doc. 22-5 ¶¶ 28-28.1; *see id.* ¶¶ 29-30 (also pleading "negligence, carelessness and recklessness").

[137] *Id.* ¶¶ 28.3-28.4.

[138] If this analysis seems cursory, rest assured that the Court will shortly explain the potential for coverage in great detail. Here, focusing on the allegations in the underlying complaint, it is enough that Mill pled a negligence claim and noted the potential for defensive intent and that Peddigree's intoxication may have affected his "actions/judgment."

### 3.    Duty to Indemnify

In a normal declaratory judgment case, the court's finding that Nationwide had a duty to defend would also trigger a conditional duty to indemnify,[139] and this litigation would then await a determination of the insured's liability in the underlying action to ultimately resolve whether the "damages [are] within the coverage of the policy."[140] But the underlying action is over, and the basis of Peddigree's liability was never determined.[141] Therefore, it falls to this Court to consider the question of Peddigree's actions on the merits to determine whether he is liable for damages that fall within the scope of the umbrella policy. Because intoxication may significantly alter the insured's state of mind,[142] the cases dealing with intoxicated insureds are the most apt comparators for the present case.

In *Stidham v. Millvale Sportsman's Club*, the leading insurance intoxication case, the Pennsylvania Superior Court held that an intentional-acts exclusion did not necessarily bar insurance coverage when the insured, Robert McLaughlin, shot and killed Brett Stidham in a bar.[143] The relevant facts showed that McLaughlin

---

[139]  *Selective Way*, 119 A.3d at 1050 (citing *Gen. Accident Ins. Co. of Am. v. Allen*, 692 A.2d 1089, 1095 (Pa. 1997)).

[140]  *QBE*, 148 A.3d at 788 (citing *Selective Way*, 119 A.3d at 1046).

[141]  Doc. 23-10 ¶ 1 (stating generally that settlement was "based upon facts set forth in Mill's amended complaint").

[142]  *Mehlman*, 589 F.3d at 112 (Intoxication can negate intent or "can contribute to the loosening of a person's inhibitions without eliminating his ability to intend to engage in harmful conduct. Indeed, the effect of the use of alcoholic beverages may contribute to a party formulating an intent to engage in anti-social conduct.").

[143]  *Stidham*, 618 A.2d 945.

was not violent, had never been arrested, and rarely drank.[144] On a few occasions, however, he drank to excess and experienced alcoholic blackouts.[145] On the day of the shooting, McLaughlin went to the Millvale Sportsman's Club, where he was a member, to shoot skeet.[146] While there, "[h]e consumed a substantial amount of alcohol and began to lose awareness of his actions."[147] After leaving the Club, his recollection of events became "limited," but he recalled stopping at the Plane View Inn.[148] At the Inn, McLaughlin drank two shots of bourbon and two draft beers.[149] He did not speak to anyone, nor did he appear agitated.[150] Eventually, "McLaughlin left the bar and went to his truck. He reentered the bar with his shot gun. He does not remember using the gun. He remembers leaving the bar when he heard shattering glass. He proceeded to drive home."[151] Upon arriving at home, McLaughlin passed out in his car and later vomited.[152] The next morning, he read about the shooting in the paper and "[a]lthough he had no awareness of participating in such a shooting, he felt that he was in the bar and that he might have had some connection with it."[153] McLaughlin eventually turned himself in

---

[144] *Id.* at 948.
[145] *Id.*
[146] *Id.* at 948-49.
[147] *Id.* at 949.
[148] *Id.*
[149] *Id.*
[150] *Id.*
[151] *Id.*
[152] *Id.*
[153] *Id.*

and pled guilty to third degree murder, aggravated assault, recklessly endangering another person, and criminal mischief.[154]

In considering how McLaughin's intoxication affected insurance coverage, the Superior Court explained that McLaughlin's "fragmentary memories," failure to recall "getting his gun and reentering the tavern," and the fact that the attack on Stidham appeared entirely random, all indicated that McLaughlin may not have been "conscious[ly] aware[]" of his actions.[155] Applying this reasoning to the *Elitzky* interpretation of an intentional-acts exclusion, the court concluded that summary judgment was inappropriate because intent "connote[s] an element of *conscious awareness* on the part of the insured."[156]

In perhaps the closest analogue to the present case, in *State Farm Fire & Casualty v. Dunlavey*, the Honorable Petrese B. Tucker of the United States District Court for the Eastern District of Pennsylvania, analyzing an "occurrence" policy provision, found that summary judgment was inappropriate on the issue of intent when the insured struck another bar patron in the head with his motorcycle helmet.[157] The evidence confirmed that the insured was intoxicated, and also showed that he was "being generally obnoxious, harassing bar patrons and spewing

---

[154] *Id.* at 948, 949.
[155] *Id.* at 951.
[156] *Id.* at 953 (quoting *Elitzky*, 517 A.2d at 991) (emphasis added in *Stidham*).
[157] 197 F. Supp. 2d 183, 192 (E.D. Pa. 2001).

obscenities."[158] Additionally, he was blind in one eye.[159] When bar staff tried to eject him, the insured continued to argue with employees and patrons, including the victim, until, for one reason or another (the facts were in dispute), the victim struck him in the face.[160] The insured then, either in retaliation or defense, swung his motorcycle helmet and struck the victim in the head.[161] Judge Tucker reviewed the totality of the circumstances and concluded that the applicable legal standards regarding intoxication and specific intent, "coupled with the evidence of the insured's intoxication, physical infirmity in his left eye, temporary injury to his right eye, and the conflicting testimony as to intent," created a dispute of fact that precluded summary judgment to the insurer.[162] Thus, *Dunlavey* suggests that intoxication less extreme than that in *Stidham*, when paired with indicia of innocent intent, can create a question of fact.

In several other cases, courts applying Pennsylvania law have allowed cases to proceed on the basis of evidence or allegations that an insured was too intoxicated to form the necessary intent for an intentional-acts exclusion or an

---

[158] *Id.* at 188-89.

[159] *Id.* at 189.

[160] *Id.* at 189. The potential precipitating events included: (1) the insured was sexually harassing the victim and she slapped him, so he struck her in retaliation; (2) the victim struck the insured "out of the blue," so he struck her in retaliation; (3) the two pushed each other before the victim struck the insured and he struck her back; (4) the victim struck the insured "without warning, temporarily blinding him" and breaking his glasses, so the insured swung the helmet at her "simply to defend his eye until he could 'figure out what was going on'"; and (5) after being struck and blinded, the insured heard a "commotion" and swung his helmet to defend himself from general threats. *Id.* at 189-90.

[161] *Id.* at 189-90.

[162] *Id.* at 192.

"occurrence" provision to apply. For example, in *DeCoster*, the Superior Court concluded that DeCoster's intoxication, paired with the other circumstances indicating an innocent intent, precluded summary judgment.[163] And in *IDS Property Casualty Insurance Co. v. Schonewolf*, the Honorable Gerald A. McHugh, Jr., writing for the Eastern District of Pennsylvania, denied the insurer's motion to dismiss a duty to defend claim when the underlying complaint included allegations that the insureds, who were under 21, "consum[ed] alcoholic beverages . . . knowing that it would cause significant impairment and lapse of judgment and control."[164]

On the other hand, some Pennsylvania courts have rejected intoxication arguments where the insured was not extremely inebriated or where indicia of intent to harm were present. In *Nationwide Mutual Insurance Co. v. Hassinger*, the Superior Court affirmed a jury verdict that an insured acted intentionally in hitting a victim with his car despite his intoxication when the intoxication instruction was correctly given and the record contained evidence that the insured got out of his car and said "I told you I would get the son-of-a-bitch."[165] In *State Farm Mutual Automotive Insurance Co. v. Martin*, the Superior Court held that intoxication did

---

[163] *DeCoster*, 67 A.3d at 50.

[164] 111 F. Supp. 3d 618, 625-26 (E.D. Pa. 2015); *cf. Charter Oak Fire Ins. Co. v. Lazenby*, No. 10-CV-138, 2012 WL 2958246, at *6-7 (W.D. Pa. July 18, 2012) (denying summary judgment on duty to defend claim when complaint in the underlying litigation included allegations that the insured was intoxicated and insurer conceded that allegations were sufficient to support negligence).

[165] 473 A.2d 171, 173, 176 (Pa. Super. Ct. 1984).

not negate intent when the record showed that the insured had a blood alcohol level of .26 percent, his speech was slurred, and he smelled of alcohol.[166] The record further reflected that the insured had driven to his estranged wife's house at around midnight, where he twice rammed his truck into the back of his wife's car, then drove into the lawn and hit his wife, then hit a wall of the house and slammed it three additional times, and finally struck his wife's boyfriend's vehicle.[167] When questioned by police, the insured "told them he had aimed for his wife but hoped she was alright."[168] *Hassinger* and *Martin* therefore teach that indicia of intent to harm can override the effects of intoxication, even when severe.

Federal courts applying Pennsylvania law have also rejected arguments that an insured's intoxication negated his intent. In *Mehlman*, the Third Circuit held that the insured acted intentionally as a matter of law notwithstanding his intoxication when the evidence showed that the insured "consum[ed] a number of alcoholic drinks within a short time [and] became visibly intoxicated and cognitively impaired."[169] Once inebriated, the insured walked 1.5 miles to his estranged girlfriend's house, where he encountered the victim, his girlfriend's tenant.[170] The insured asked for his girlfriend and, when the victim told him she

---

[166] 660 A.2d 66, 67-68 (Pa. Super. Ct. 1995).

[167] *Id.* at 67.

[168] *Id.*

[169] 589 F.3d at 108 (a toxicology report later showed that a few hours after he may have stopped drinking he still had a blood alcohol content of 0.21 percent).

[170] *Id.*

was out of town, became agitated and began threatening the victim.[171] When the victim attempted to leave, the insured drew a handgun, pointed it at the victim's head, and pulled the trigger—the gun misfired.[172] The victim continued her attempt to flee, crashing her car before managing to escape; while she tried to get away, the insured pointed the gun at her twice more at extremely close range, but it again misfired each time.[173]

The Third Circuit explained that the "indicia of intent" proved intentional conduct: the insured had walked "one and one-half miles," to his girlfriend's residence, showing that he "knew the route to take and he had the ability to walk the considerable distance to get there," and had attempted to shoot the victim repeatedly, demonstrating that "he knew what he was doing and . . . that his intoxication had a limited impact on his use of his faculties."[174]

And finally, in *Homesite Insurance Co. ex rel. Insurance Counselors, Inc. v. Neary*, the Honorable Harvey Bartle III, writing for the Eastern District of Pennsylvania, held that summary judgment for the insurer was proper when the allegations in the underlying complaint only described unprovoked, unjustified, and intentional assaults by the insured.[175] The underlying complaint "merely

---

[171] *Id.*
[172] *Id.*
[173] *Id.*
[174] *Id.* at 114-15.
[175] *Homesite Ins. Co. ex rel. Ins. Couns. Inc. v. Neary*, 341 F. Supp. 3d 468, 471-73 (E.D. Pa. 2018) (describing multiple attacks "without provocation").

allege[d] that [the insured] 'consumed alcohol' on the night of the assault," with "no allegation that [the insured] was in the midst of an alcoholic blackout or that he completely lost awareness of his actions when he attacked [the victim]."[176] Judge Bartle held that such allegations were insufficient to create a factual dispute about the intoxication's impact on the insured's ability to form intent.[177]

In sum, precedent suggests that intoxication affects an insured's ability to form an intent and to properly appreciate his situation. Extreme intoxication negating conscious awareness can create a question of fact regarding intent even when indicia of innocent intent are lacking,[178] while lesser but still severe drunkenness can do the same when paired with a plausible innocent explanation from the perspective of the intoxicated insured.[179] But drunkenness alone does not create a dispute of fact,[180] nor will heavy intoxication overcome clear manifestations of malicious intent.[181]

This case is closer to *Stidham* and *Dunlavey* than *Mehlman*, *Hassinger*, and *Martin*, and the Court therefore concludes that there is a genuine dispute of fact as to Peddigree's intent. There is no dispute that Peddigree was intoxicated, and the

---

[176] *Id.* at 473-74.

[177] *Id.* at 474 ("[T]he conclusory allegation that Neary consumed alcohol, without more, is insufficient to trigger Homesite's duty to defend.").

[178] *Stidham*, 618 A.2d at 951.

[179] *Dunlavey*, 197 F. Supp. 2d at 192; *DeCoster*, 67 A.3d at 50.

[180] *See Mehlman*, 589 F.3d at 112 (citing *Martin*, 660 A.2d at 68).

[181] *Mehlman*, 589 F.3d at 115; *Martin*, 660 A.2d at 67; *Hassinger*, 473 A.2d at 173, 176.

record reflects that his intoxication was likely severe.[182] As a result, Peddigree was weaving in and out of alcoholic blackouts throughout the evening.[183] From Peddigree's perspective of the incident,[184] he heard his girlfriend cry out for help and then everything went black, except for the sound of glass breaking.[185] He testified that he "didn't even realize what [he] was doing [with the bottle] . . . it was already in [his] hand."[186] Critically, when asked directly whether "when you hit him with your bottle was it your intention to cause the injuries you caused to that extent," Peddigree responded "[n]o, *I never meant to hurt him*. I still feel terrible about it."[187] Peddigree's statement is supported by indicia of an innocent intent to defend: witnesses, including Peddigree, described Peddigree telling Mill to stop touching Dauberman as he attacked,[188] and everyone but Mill agrees that

---

[182] *See* Doc. 23-12 at 22:1-7 (describing consumption of more than twenty drinks in six hours); *see also* Doc. 28-14 (Expert Report of Michael Greenberg) at 4 (estimating that Peddigree's blood alcohol content was approximately 0.23%).

[183] Doc. 23-12 at 22:10-14.

[184] *Baumhammers*, 938 A.2d at 293.

[185] Doc. 23-12 at 18:22-24; *see id.* at 17:5-19:7; Doc. 22-4 at 23:6-25:6; *see Stidham*, 618 A.2d at 949 (recalling only the sound of glass breaking). Nationwide states that "Mr. Peddigree conceded under oath that he was aware of the assault," Doc. 33 at 10, but only cites statements that prove his recollection of some of the events following the assault.

[186] Doc. 23-12 at 18:2-4.

[187] *Id.* at 18:5-9 (emphasis added).

[188] *Id.* at 17:11-12; Doc. 28-20 (Investigative Note of John Rickert Statement) at 2 ("He heard Peddigree yell 'Dude, stop touching her.'").

The Court notes that Peddigree's recollection that he said something at almost the same time that he claims he cannot recall striking Mill appears inconsistent. This tension is not sufficient to negate the disputes of material fact. Intoxicated recollections are rarely a model of clarity, and fragments of a single event may drift in and out of focus in the drinker's mind. A jury is best positioned to draw on their own experiences to interpret all of the facts and decide what was in Peddigree's mind when he struck Mill.

Dauberman called out for help.[189] Finally, Peddigree stated that he did not remember the attack just moments after it occurred, and turned himself in to the police as soon as he was told what he had done.[190]

On the other hand, there are no true indicia of an intent to harm other than the attack itself. Nationwide tries to argue that Peddigree continued to attack Mill once the two went to the floor and that that should be evidence of an intent to harm, but Peddigree has no recollection of that part of the incident either. Although viewing these facts in the light most favorable to Nationwide would suggest that Peddigree was out to do damage, viewed in the light most favorable to Mill, in Peddigree's drunken state, he may have thought that the threat from Mill continued.

Considering the totality of the circumstances, including Peddigree's intoxication and inability to remember the attack, the existence of a precipitating event, Peddigree's statement suggesting innocent intent, and the lack of compelling indicia of intent to harm on the one hand, and the severity and length of Peddigree's attack on the other, the Court concludes that there is a genuine dispute of material fact regarding Peddigree's intent to harm Mill, which is sufficient to bar summary judgment on every contractual provision. The above factors could be

---

[189] Doc. 23-17 at 21:23-22:1; Doc. 23-16 at 1; Doc. 23-15 at 1; Doc. 23-12 at 17:9-11, 19:4-7; Doc. 22-4 at 22:10-13, 23:6-9; *but see* Doc. 22-3 at 30:6-9.

[190] Doc. 22-4 at 26:21-27:14 ("Q. You decided right then to go to the police station? A. Yeah. Q. Why? A. Just to turn myself in. Q. Why? A. Because they told me I struck someone with a beer bottle. Q. Who told you that? A. My friend, John Riccard [sic].").

understood as evidence that an extremely intoxicated Peddigree was confronted with an unexpected threat, causing him to innocently and impulsively react in defense of his girlfriend. On that understanding, Peddigree's actions could be considered accidental and unintentional under Pennsylvania insurance law, and the resulting harm therefore may be covered under the umbrella policy.[191] Accordingly, neither party is entitled to summary judgment on the merits.

### 4.    Estoppel

The possible merits notwithstanding, Nationwide argues that Peddigree's criminal guilty plea ends this case because "public policy precludes a finding that a criminal act is an 'occurrence,'" and Mill is estopped from arguing that Peddigree acted in defense of another.[192] Neither contention is correct.

Tellingly, in its public policy argument, Nationwide cites law for the proposition that "[i]t is against the public policy of this Commonwealth to provide insurance coverage for intentional acts," a point that is true but adds nothing to the above discussion about intent, especially given that "an 'intended' harm clause should be coterminous with the public policy exclusion" of coverage for

---

[191] This reasoning also applies to deny summary judgment on Nationwide's argument that the facts establish that Peddigree was not acting in defense of another and Mill's argument that Peddigree was doing so, because the self-defense exception is solely concerned with the insured's intent, which is uncertain.

[192] Doc. 17 at 8.

intentional acts.[193] Nationwide's resort to this inapposite citation makes sense when considering the actual law regarding the impact of criminal convictions on insurance coverage, a discussion that Nationwide eschews, presumably because the law is settled against it.

"[A] conviction in prior criminal proceedings cannot preclude a victim from litigating the issue of the insured actor's intent where a determination of intent was not essential to the conviction."[194] A court should look to the elements of the criminal conviction to determine whether proof of intent was required.[195]

Neither of the charges to which Peddigree pled guilty—simple assault and reckless endangerment—requires proof of intent as defined in the insurance context under Pennsylvania law. Among other things, a person is guilty of simple assault if he "negligently causes bodily injury to another with a deadly weapon."[196] Negligent conduct does not meet the standard of intent in an insurance contract,[197] and Peddigree's guilty plea to the simple assault charge therefore does not estop Mill from arguing intent here. A person is guilty of reckless endangerment if "he recklessly engages in conduct which places or may place another person in danger

---

[193] *Elitzky*, 517 A.2d at 989; *see Martin*, 660 A.2d at 67-68 (accepting that insured's acts were criminal but analyzing whether they were intentional); *see Stidham*, 618 A.2d at 951-54 (same).

[194] *Dunlavey*, 197 F. Supp. 2d at 88 (citing *Stidham*, 618 A.2d at 954).

[195] *Stidham*, 618 A.2d at 951-52 (listing elements of third degree murder).

[196] 18 Pa. Cons. Stat. § 2701(a)(2).

[197] *Elitzky*, 517 A.2d at 989-90.

of death or serious injury."[198] A person acts "recklessly" when he "consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct."[199] Although a closer question, a "substantial . . . *risk* that [harm] . . . will result" is a somewhat lower level of culpability than the insurance intent standard that harm is "substantially *certain* to result."[200] Accordingly, Peddigree's guilty plea to reckless endangerment does not prove that he acted intentionally, and neither public policy nor the contract prohibits coverage on that basis.

Similarly, Nationwide's contention that Mill is estopped from arguing that Peddigree acted in in defense of another fails because the defense issue, as it pertains to insurance, was not determined in Peddigree's criminal proceeding. Nationwide is correct that "a plea of guilty amounts to a waiver of all non-jurisdictional defects and defenses."[201] But, when used as evidence in a civil case, a guilty plea only serves to prove the guilty party's commission of the elements of

---

[198]  18 Pa. Cons. Stat. § 2705.

[199]  18 Pa. Cons. Stat. § 302(b)(3).

[200]  *See Elitzky*, 517 A.2d at 989 (emphases added); *id.* (explaining that "it is essential to distinguish intent from recklessness"); *Stidham*, 618 A.2d at 948, 951, 953 (reasoning that argument on intent was not precluded by guilty pleas to third degree murder, which can be proved by showing that "the principle act[ed] in gross deviation from the standard of reasonable care, failing to perceive that such actions might create a substantial and unjustifiable risk of death or serious bodily injury," (citing *In Interest of Smith*, 579 A.2d 889, 895 (Pa. Super. Ct. 1990)), and reckless endangerment (citing *Commonwealth v. McLaughlin*, 574 A.2d 610, 612 (Pa. Super. Ct. 1990) (in turn citing 18 Pa. Cons. Stat. § 2705))); *Dunlavey*, 197 F. Supp. 2d at 187-88 (finding that conviction for "recklessly endangering another person" did not estop intent argument because conviction may be "predicated on reckless conduct").

[201]  *Commonwealth v. Brown*, 240 A.3d 970, 972 (Pa. Super. Ct. 2020) (citing *Commonwealth v. Morrison*, 173 A.3d 286, 290 (Pa. Super. Ct. 2017)).

the crime charged.[202] And where there is ambiguity about how the elements may have been satisfied, such that they might not prove a fact at issue in the civil case, summary judgment based on a guilty plea is improper.[203] Applying this narrow view of the utility of a guilty plea to the potential defense of another argument, Peddigree has only admitted that he did not satisfy all of the defense's elements.

Under Pennsylvania law, the criminal defense of defense of another is strictly defined. To raise an argument of defense of another, a criminal defendant must introduce evidence that he used force against a perceived attacker because he "[reasonably] believe[d] that such force [wa]s immediately necessary for the purpose of protecting [a third person] against the use of unlawful force by [the perceived attacker] on the present occasion."[204] The putative defender's belief must be both subjectively and objectively reasonable.[205] Furthermore, force used in self-defense or defense of others is not justified when the harm done in defense is greater than the harm sought to be avoided.[206] In other words, force used in defense

---

[202] *Stidham*, 618 A.2d at 952.

[203] *Id.* at 951-53.

[204] 18 Pa. Cons. Stat. § 505(a); *see* 18 Pa. Cons. Stat. § 501 (defining "believes" as "reasonably believes"); *Commonwealth v. Mayfield*, 585 A.2d 1069, 1074 (Pa. Super. Ct. 1991) (en banc).

[205] *Commonwealth v. Mouzon*, 53 A.3d 738, 751-52 (Pa. 2012) (citing *Commonwealth v. Light*, 326 A.2d 288, 292 (Pa. 1974)).

[206] 18 Pa. Cons. Stat. § 503(a).

of others may not be "excessive," especially when an actor is confronted with non-deadly force.[207]

Even if Peddigree's guilty plea establishes that he did not act in defense of another under the above definition, Mill is not precluded from arguing the substantially different version of self-defense as defined in the umbrella policy. As the Court has interpreted the contract, the self-defense exception is concerned solely with the insured's *intent* in acting. Thus, although the "reasonable belief" element of criminal self-defense may be similar to the issue at hand (although the Court is not convinced that it is a perfect analogue, given the high standard of proving an intentional act in the insurance context), the requirement of proportionality cannot be dispositive of the question of coverage. And that means that Peddigree's guilty plea proves nothing with respect to whether he acted with the primary intent of defending another: indeed, it is likely that he waived the criminal defense <u>because</u> of the proportionality requirement, rather than conceding that he did not reasonably believe that defense was necessary.

Finally, it appears that Mill may be arguing that Nationwide should be estopped from challenging the judgment approving his settlement with Peddigree.[208] In *Stidham*, the Pennsylvania Superior Court ultimately held that

---

[207] *Commonwealth v. Cutts*, 421 A.2d 1172, 1173-74 (Pa. Super. Ct. 1980) (citing *Commonwealth v. Jones*, 332 A.2d 464, 465-66 (Pa. Super. Ct. 1974)); Restatement (Second) of Torts § 70 (Am. L. Inst. 1965).

[208] Doc. 25 at 22-23 (citing *Stidham*, 618 A.2d at 955).

Aetna was estopped from disputing the issue of Stidham's intent because of the jury's verdict of negligence in the underlying action.[209] That conclusion does not apply here because the issue of negligence was never determined in this underlying civil action.[210] True, Mill's complaint asserted a claim of negligence.[211] But he also brought a claim for "civil assault and battery" based on the same facts,[212] and both claims feature a paragraph alleging that Peddigree's actions were "not only negligent, but also reckless, willful, wanton, outrageous, *intentional* and indifferent to the rights of [Mill]."[213] The settlement that resolved that litigation, was "based upon facts set forth in Mill's amended complaint."[214] It did not specify that it was predicated upon the negligence claim nor profess to resolve the issue of intent,[215] and, even if it did, the Court would not be inclined to credit findings of fact in the potentially "collusive[]" settlement agreement that is shot through with Mill and

---

[209] *Stidham*, 618 A.2d at 955.

[210] *See Skotnicki v. Insurance Department*, 175 A.3d 239, 247 (Pa. 2017) ("It is well-settled that the doctrine of collateral estoppel precludes relitigation of an issue settled in a previous action if: (1) the issue decided in the prior case is identical to the one presented in the later action . . ." (quoting *Office of Disciplinary Counsel v. Kiesewetter*, 889 A.2d 47, 50-51 (Pa. 2005)).

[211] Doc. 22-5 ¶¶ 21-31.

[212] *Id.* ¶¶ 32-38.

[213] *Id.* ¶¶ 31, 38 (emphasis added).

[214] Doc. 23-10 ¶ 1.

[215] *See Stidham*, 618 A.2d at 954 (explaining that collateral estoppel requires the identical issue to have been decided in the prior case (citing *City of Pittsburgh v. Zoning Bd. of Adj.*, 559 A.2d 896, 901 (1989)); *Home Depot USA, Inc. v. Lafarge N. Am., Inc.*, 59 F.4th 55, 64 (3d Cir. 2023) ("Settlements 'ordinarily occasion no issue preclusion,' unless the parties clearly 'intend their agreement to have such an effect.'" (quoting *Arizona v. California*, 530 U.S. 392, 414 (2000)); 18 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 4443, pp. 384–385 (1981).

Peddigree's joint desire for Nationwide to provide indemnification.[216] Accordingly, Nationwide is not estopped from arguing intent.

## III.    CONCLUSION

Peddigree's intoxication and the circumstances surrounding his attack on Mill create a genuine issue of material fact as to his intent and whether his actions may be covered under the umbrella policy as an "occurrence" and an unintentional act. Neither party is estopped from litigating this case based on the earlier related litigation. Mill's motion for summary judgment is granted as to Nationwide's duty to defend and denied as to its duty to indemnify. Nationwide's motion for summary judgment is denied.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

---

[216]  *See Stidham*, 618 A.2d at 955.